Filed 12/11/15  P. v. Casas CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H041362 |
| Plaintiff and Respondent, | (Monterey County Super. Ct. No. SS140208) |
| v. | |
| LEONARDO CASAS, | |
| Defendant and Appellant. | |

## INTRODUCTION

A jury convicted defendant Leonardo Casas of two counts of first degree residential burglary (Pen. Code, § 459).[1]  On appeal, defendant contends that the trial court erred in admitting incriminating statements that defendant made to police officers, as they were obtained in violation of his *Miranda*[2] rights and were involuntary.  We conclude that the trial court properly admitted defendant's statements, as they were not the product of a custodial interrogation nor were they involuntary.

---

[1] All further statutory references are to the Penal Code, unless otherwise stated.

[2] *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

**FACTUAL AND PROCEDURAL BACKGROUND**

### 1.  The Incident Occurring Between January 1 and January 18 (Count 2)

In January 2014, Fernando Casas lived in a home on Harding Street in Seaside, California.  His wife Maria, his 15-year-old daughter Elizabeth, his three sons, his cousin Crescencio, and Crescencio's wife also lived in the same home.

Defendant is Fernando's cousin.  Prior to 2014, defendant also lived in the Harding Street home until Fernando asked him to move out after Elizabeth caught defendant holding a pair of her underwear.  Defendant moved in with his sister Susanna, who lived a few blocks away.

On a day in early January 2014, around 5:00 a.m., Fernando discovered that the door between the garage and the kitchen, which was normally left unlocked, was locked from the outside (the garage side).  The larger garage door, which opens out to the street, was open two or three feet.  Fernando indicated that the larger garage door would normally be closed, as he kept many valuable items in the garage.  Fernando reported that none of his expensive tools or instruments were missing from the garage.  However, later, Elizabeth noticed that her underwear and pajama bottoms were missing from the dryer.

### 2.  The January 19 Incident (Count 1)

On January 19, 2014, Maria heard a noise around 3:00 a.m.  Maria alerted Fernando, who got up from bed and discovered that the front door of the house was partially open.  The chain, which was used to lock the front door, had been undone.  A kitchen window was also open.  Outside the house, there was a large piece of wood propped up next to the open kitchen window.  The wood was placed in a way that it could have assisted someone to enter through the window.

Fernando checked the garage, where the washer and dryer were located.  The dryer door was open, and it appeared as if clothes had been pulled from the dryer.  A pile of clothes was on the floor.  There was also a wooden dresser in the garage.  The dresser drawers were open, and clothes were hanging from the drawers.

Fernando suspected that defendant broke into his house because defendant knew the layout of the house and knew that the garage locked from the outside. Fernando also suspected defendant because he had heard that defendant wore women's clothing. Fernando got into his truck and drove towards defendant's apartment. As Fernando was driving, he saw defendant crouch down behind a shrub.

Cresencio also suspected defendant was the intruder because he had seen defendant wear women's clothing in the past. He recalled one time that defendant had been wearing red women's underwear and another time where defendant had been wearing a bra underneath his shirt. After the break-in, Cresencio left the house and went towards defendant's apartment. When Cresencio arrived at the apartment complex, he observed defendant running towards the apartment and then hiding when Fernando's truck drove by on the street.

When Fernando returned home, he called the police. Seaside Police Officer Joseph Rogish responded to the dispatch call around 3:00 a.m. and spoke to Fernando, Cresencio, and Elizabeth about the incident. Cresencio took Officer Rogish to defendant's apartment complex and showed him where defendant lived.

The next night, Officer Rogish went to defendant's apartment to conduct an interview. Officer Edwardo Enriquez, who was acting as a translator, accompanied Officer Rogish. During that interview, defendant confessed his involvement in both burglary incidents. He explained that in both instances, he entered Fernando's home to steal women's undergarments. He admitted to taking some articles of women's clothing during the first incident, which took place one or two weeks prior. After defendant confessed to the burglaries, the officers arrested defendant.

The officers also spoke to defendant's sister, who said that she had found women's underwear in defendant's bedroom approximately one week prior. The undergarments did not belong to her, and she threw them away shortly after finding them.

3

### 3. *The March 10 Incident (Count 3)*[3]

On March 10, 2014, Cresencio woke up after hearing the door between the kitchen and the garage open. He got up and walked over to the kitchen/garage door, but it was locked from the garage side. Cresencio went outside through the front door of the house. As he walked outside, Cresencio heard the back door, which was between the garage and the yard, open. Cresencio headed towards the back door, and observed defendant coming out of the garage with "something white" in his hands. As defendant exited the garage, Cresencio said to defendant, "Here you are again with your things, Leonardo?" Upon seeing Cresencio, defendant immediately started running away and jumped the fence in the yard. Cresencio ran after him and also jumped the fence. Defendant jumped a second fence, and then fell to the ground. Crescencio was unable to follow him. Later, Maria's pink shirt, which had been in the garage prior to the incident, was found in the yard. Cresencio returned to the house and informed Fernando that someone had broken into the house again. Fernando went to the garage and observed that the clothes in the garage had been out of order.

Around 12:40 a.m., Seaside Police Officer Matthew Hoffman responded to a dispatch call reporting a victim of robbery on Broadway and Kenneth Street. When Officer Hoffman arrived at the reported location, he encountered defendant, who appeared disheveled and bloody around the mouth and nose area. Officer Hoffman also noticed that defendant wasn't wearing any shoes and that his socks had dirt on the bottom and holes around the toe and heel area. Defendant stated that he was injured by two black men who had jumped him. Defendant claimed that the men stole his wallet; however, he was holding his wallet in his hand at the time of the interview. Defendant changed his story to state that the men tried to take his wallet.

---

[3] Defendant had been out on bail at the time this incident occurred.

4

### 4. *Defense Evidence*

Defendant testified in his own defense. He denied that he entered Fernando's garage at any point between January to March 10 to take property. Defendant testified that on January 20, 2014, the police came to his house and "bang[ed] on the door loudly." He had been sleeping at the time. Defendant recalled that one of the officers asked if he could come inside the house, but he did not allow the officers in the house. Defendant stood at the doorway while the officers questioned him about the burglary that occurred at Fernando's house. Defendant denied knowing anything about the incident. The officer then told defendant that there were witnesses who saw him enter the house and that Cresencio had followed defendant to his apartment. Defendant asked the officer what he was "getting at with all of this." He did not tell the officers he was involved in either of the January incidents.

Defendant testified that on March 10, 2014, he was at his home celebrating his birthday. He left his house around midnight and was jumped by two black men near the Broadway and Kenneth Street intersection. Defendant called the police shortly thereafter. He denied going over to Fernando's house that evening to steal property.

### 5. *Charges, Evidentiary Hearing, Jury Trial, and Sentencing*

On June 19, 2014, the district attorney filed an amended information charging defendant with three counts of first degree residential burglary (§ 459). As to counts 1 and 3, it was further alleged that offenses were violent felonies (§ 667.5, subd. (c)). Additionally, as to count 3, it was alleged that defendant committed the offense while he was released on bail (§ 12202.1).

Prior to trial, defendant filed a motion for an Evidence Code section 402 hearing, in which he challenged the admissibility of the statements he made to the police on January 20. On June 16, 2014, the trial court held a hearing, where it requested an offer of proof on the admissibility of the confession. After argument, the court ruled that defendant's confession was admissible, finding that the confession was not the product of

5

a custodial interrogation that warranted *Miranda* protection. The court placed emphasis on the fact that this interview took place at defendant's home. The court observed "the cases do seem to distinguish when you're at home from other locations. And I think that under all the totality of the circumstances, from what I've seen, from what I've been told, that the actual location of the interview was selected by the defendant. The suggestion of the officers to do it inside was controlled by the defendant, and they accommodated his preference to be doing it outside. [¶] I think that actually goes a long way to determining whether or not it was custodial for purposes of Miranda. The Court makes the finding that there is no custodial interrogation, at least at this point."

The jury trial commenced on June 16, 2014. On June 19, 2014, the jury returned its verdict, finding defendant guilty of the January 19 and March 10 offenses (counts 1 and 3). The jury found defendant not guilty of the offense that had occurred between January 1 through 18 (count 2).

At the sentencing hearing on August 13, 2014, the trial court imposed an aggregate term of five years four months, which consisted of a lower term of two years on count 1, a consecutive middle term of one year four months on count 3, and a consecutive two-year enhancement for having been on bail at the time count 3 was committed.

## DISCUSSION

Defendant contends that the trial court erred in admitting the incriminating statements he made to the police on January 20, 2014, because they were obtained in violation of *Miranda*. Defendant acknowledges that trial counsel did not object to the statements on *Miranda* grounds again at trial, and thus argues that counsel rendered ineffective assistance. Furthermore, he argues that counsel was ineffective for further failing to object to the statements on involuntariness grounds. Although counsel did not raise the *Miranda* argument at trial, she raised the objection prior to trial, and the court conducted an Evidence Code section 402 hearing accordingly. Thus, as to defendant's

6

*Miranda* claim, we conclude that the contention was adequately preserved on appeal. The Attorney General does not argue otherwise. However, as to the argument that the statements were involuntary, defense counsel failed to raise that objection entirely. We therefore consider whether counsel's failure to object to the admission of the statements on involuntariness grounds constituted ineffective assistance.

### 1. Relevant Factual Background

Around 2:00 a.m. on January 20, Officer Rogish and Officer Enriquez went to defendant's apartment to conduct a follow-up investigation of the burglary incident that occurred at Fernando's house the night before. Defendant answered the door. With Officer Enriquez translating, Officer Rogish asked defendant if he wanted to be interviewed inside or outside the house. Defendant stepped outside on the front porch to talk to the officers. During the interview, the officers did not stand in a way that would block defendant from leaving his residence.

Officer Rogish informed defendant that he was investigating the two incidents that took place at Fernando's residence from the night before and from one to two weeks ago. Defendant was the only suspect at that time. Officer Rogish first provided limited information about the case, and he asked whether defendant had any information regarding either incident. Defendant denied having any information or involvement with either incident. Officer Rogish then told defendant that he had "felt like [defendant] had been involved and that the circumstances were that there was women's undergarments that were involved." The officer told defendant that he "wasn't going to judge [defendant] on his lifestyle choices, but that it was [his] job to investigate this crime and that [defendant] needed to be truthful . . . ." Officer Rogish also used a ruse during the course of his interview. Specifically, he told defendant that he had recovered a fingerprint from the dryer from the initial burglary and that Fernando's sons had seen defendant entering the home. These two statements were false.

7

Defendant eventually confessed to his involvement in both burglary incidents. With respect to the first incident, defendant stated that around 11:00 p.m., he went to Fernando's home and entered the garage by lifting the large garage door. He went inside the garage, looked through the dryer, and then took some articles of women's clothing. He admitted that his intent was to steal women's undergarments. With respect to the second incident on January 19, defendant stated that he gained entry into Fernando's home by opening the kitchen window. He used a piece of wood from the front yard in order to boost himself up to the window. Once inside the kitchen, he went to the garage and attempted to find women's undergarments in the dryer and the wooden dresser. He said that he was unable to find what he was looking for, so he left the house through the front door. He told the officers that he occasionally wears women's underwear, but he would not buy them from the store because "it was embarrassing."

Defendant was arrested after confessing. The entire interview between the officers and defendant lasted about 15 to 20 minutes.

### 1. *Miranda*

Defendant contends that he was in custody at the time he was interviewed by the police officers, and thus the officers should have advised him of his *Miranda* rights. "The now familiar rule in *Miranda* relies on the Fifth Amendment to the federal Constitution to preclude the evidentiary use of statements made pursuant to a *custodial interrogation* unless the suspect has knowingly and intelligently waived the rights to remain silent and to the presence and assistance of an attorney, the latter provided at state expense for indigent suspects. [Citation.]" (*People v. Roldan* (2005) 35 Cal.4th 646, 735, italics added, disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22; *Miranda, supra,* 384 U.S. at pp. 444-445; see *Dickerson v. United States* (2000) 530 U.S. 428, 439-440.) "Absent 'custodial interrogation,' *Miranda* simply does not come into play." (*People v. Mickey* (1991) 54 Cal.3d 612, 648 (*Mickey*).)

"Custodial" means any situation in which " 'a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.' " (*Mickey, supra,* 54 Cal.3d at p. 648.) "[T]he only relevant inquiry is how a reasonable [person] in the suspect's position would have understood his [or her] situation." (*Berkemer v. McCarty* (1984) 468 U.S. 420, 442, fn. omitted.) The test is whether a reasonable person in the defendant's position would feel that he or she was in custody—that is, whether in light of all the circumstances of the interrogation, there was a " ' "formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest.' " (*People v. Stansbury* (1995) 9 Cal.4th 824, 830; see also *Thompson v. Keohane* (1995) 516 U.S. 99, 112 (*Thompson*).) Interrogation "refers not only to express questioning, but also to any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." (*Rhode Island v. Innis* (1980) 446 U.S. 291, 301, fns. omitted.)

In this case, the parties dispute only whether defendant was in custody at the time he made his statements to the police. Whether a defendant was in custody for purposes of *Miranda* warnings presents a mixed question of law and fact. (*People v. Ochoa* (1998) 19 Cal.4th 353, 401 (*Ochoa*).) To make that determination, " '[t]wo discrete inquiries are essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave. . . .' " (*Id.* at p. 401-402; *Thompson, supra,* 516 U.S. at pp. 112-113.)

On appeal, we accept the trial court's findings of historical fact if supported by substantial evidence but independently measure those facts against the objective legal standard to determine whether the interrogation was "custodial." (*Ochoa, supra,* 19 Cal.4th at p. 401.)

In *People v. Aguilera* (1996) 51 Cal.App.4th 1151 (*Aguilera*), we articulated a number of circumstances relevant to determining whether a defendant was in custody for

the purposes of *Miranda*. "Among them are whether contact with law enforcement was initiated by the police or the person interrogated, and if by the police, whether the person voluntarily agreed to an interview; whether the express purpose of the interview was to question the person as a witness or a suspect; where the interview took place; whether police informed the person that he or she was under arrest or in custody; whether they informed the person that he or she was free to terminate the interview and leave at any time and/or whether the person's conduct indicated an awareness of such freedom; whether there were restrictions on the person's freedom of movement during the interview; how long the interrogation lasted; how many police officers participated; whether they dominated and controlled the course of the interrogation; whether they manifested a belief that the person was culpable and they had evidence to prove it; whether the police were aggressive, confrontational, and/or accusatory; whether the police used interrogation techniques to pressure the suspect; and whether the person was arrested at the end of the interrogation." (*Id.* at p. 1162.)

Defendant argues that the totality of circumstances supports a finding that he was in custody at the time he spoke to Officers Rogish and Enriquez. Defendant points out that the officers initiated the contact with defendant, the interview took place at 2:00 a.m., and defendant was the sole suspect at that time. Additionally, after defendant initially denied his involvement, the officers had told him that they believed he was involved and that they needed him to be truthful. It also appears that the officers never explicitly told defendant that he could refuse to talk or that he was free to terminate the interview and leave. Furthermore, the officers told defendant that they recovered fingerprints and that Fernando's sons saw him break in, even though these two statements were false. Finally, defendant was arrested after the questioning.

We acknowledge that several of the circumstances listed in *Aguilera* support the contention that defendant was in custody. However, "[n]o one factor is dispositive. Rather, we look at the interplay and combined effect of all the circumstances to

10

determine whether on balance they created a coercive atmosphere such that a reasonable person would have experienced a restraint tantamount to an arrest." (*Aguilera*, *supra*, 51 Cal.App.4th at p. 1162.)

In our view, the totality of the circumstances, on balance, support the trial court's finding that defendant was not in custody at the time he confessed to the police. Here, the interview took place outside of defendant's own home. Several courts have recognized that a home interview puts the defendant in a familiar and friendly environment, and thus, this factor strongly supports that the interview was non-custodial. (See *People v. Mitchell* (1990) 222 Cal.App.3d 1306 (*Mitchell*); *People v. Murphy* (1982) 127 Cal.App.3d 743, 748-749; *People v. Butterfield* (1968) 258 Cal.App.2d 586, 589-590.) In *Mitchell*, the appellate court concluded that the defendant was not in custody, especially in light of the fact that he was not "prevented from simply returning to his house's interior without speaking to the officers." (*Mitchell, supra,* at pp.1311-1312.) Similarly here, at no time did the officers restrict defendant's movement or were positioned in a way that blocked him from either leaving his residence or returning back inside his home. Moreover, the officers in this instance asked defendant whether he wanted the interview to take place inside or outside the house. Defendant chose to speak outside, and the officer's acquiesced. The fact that defendant selected the location to speak to the officers further supports that defendant was not in a situation where he experienced a "restraint tantamount to an arrest." (*Aguilera*, *supra*, 51 Cal.App.4th at p. 1162.)

Additionally, the officers were also not overly aggressive or threatening in their questioning. Although the officers told defendant that they believed he was involved with the burglaries and they used a ruse, such interrogation techniques are not dispositive of custody. (See *Stansbury v. California* (1994) 511 U.S. 318, 325 ["Even a clear statement from an officer that the person under interrogation is a prime suspect is not, in itself, dispositive of the custody issue, for some suspects are free to come and go until the

police decide to make an arrest."].)  In *Oregon v. Mathiason* (1977) 429 U.S. 492, 495, the police, as in this case, informed the defendant that he was a suspect in a burglary and they falsely informed him that his fingerprints were found at the scene of the crime. Despite the use of these interrogation techniques, the United States Supreme Court found that these were not determinative factors of whether the defendant was in custody.  (*Id.* at pp. 495-496.)  Similarly, the officer's interrogation techniques in this case did not render the interview custodial.

Moreover, there were only two officers present in this case, and one officer was acting as a translator.  The officers did not draw their weapons.  They did not place defendant in handcuffs or told him he was under arrest.  The interview was also brief, lasting only about 15 to 20 minutes.

Under these set of circumstances, we conclude that a reasonable person in defendant's position would have felt that he was at liberty to terminate the interview and leave.  (*Ochoa*, *supra*, 19 Cal.4th at pp. 401-402.)  Thus, defendant was not in custody for purposes of *Miranda* at the time he confessed to the officers.

### 2. Involuntary Statements

Defendant alternatively asserts that his trial counsel was ineffective for failing to argue that his statements to the officers were inadmissible because they were involuntary. To succeed on a claim of ineffective assistance, defendant must show that (1) his attorney's representation fell below an objective standard of reasonableness under prevailing professional norms, and (2) there is a reasonable probability that, but for counsel's errors, the result would have been different.  (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688 (*Strickland*).)  Where a "defendant has not satisfied the second part of the test, we need not consider whether trial counsel's performance was deficient." (*People v. Price* (1991) 1 Cal.4th 324, 440; *Strickland*, *supra*, at p. 697.)

"[A]n involuntary statement obtained by a law enforcement officer from a criminal suspect by coercion is inadmissible in a criminal proceeding."  (*People v. Neal*

(2003) 31 Cal.4th 63, 67 (*Neal*).)  Such a statement is inadmissible for all purposes.  (*Id.* at pp. 68-69.)  When a defendant challenges admission of his statements on this ground, the prosecution must prove the voluntariness of the statements by a preponderance of the evidence.  (*People v. Guerra* (2006) 37 Cal.4th 1067, 1093, overruled on other grounds in *People v. Rundle* (2008) 43 Cal.4th 76, 151.)  "In evaluating a claim of psychological coercion, the 'question posed . . . is whether the influences brought to bear upon the accused were "such as to overbear petitioner's will to resist and bring about confessions not freely self-determined." ' " (*People v. Kelly* (1990) 51 Cal.3d 931, 952.)

"In deciding the question of voluntariness, the United States Supreme Court has directed courts to consider 'the totality of circumstances.'  [Citations.]  Relevant are 'the crucial element of police coercion [citation]; the length of the interrogation [citation]; its location [citation]; its continuity' as well as 'the defendant's maturity [citation]; education [citation]; physical condition [citation]; and mental health.' " (*People v. Williams* (1997) 16 Cal.4th 635, 660.)

Under the totality of circumstances, we conclude that defendant's statements were voluntary and not the product of coercion.  Defendant specifically points to the officer's interrogation tactics, the fact that the interview was initiated by the officers "pounding loudly at [defendant's] door" at 2:00 a.m., and the fact that defendant is a 23 year old Mexican immigrant with no high school education and a personality disorder.  We have already determined that many of these circumstances did not render the interview custodial.  Nor, in our view, did these circumstances make the interview so coercive that it overbore defendant's will.  (See *Guerra, supra,* 37 Cal.4th at p. 1097 ["Although false statements made by the police during questioning may affect the voluntariness of a defendant's confession, ' "they are not per se sufficient to make it involuntary." ' "].)  Rather, the record shows that the officers were not overly aggressive, the interview was brief, and defendant understood and coherently responded to the officers' inquiries.  Furthermore, there are other factors here that have mitigated any coerciveness of the

13

interview. We have discussed some of these circumstances above, including the fact that interview was conducted in front of defendant's home and that defendant was given a choice to speak either inside or outside the house.

In conclusion, because we conclude that defendant's statements were voluntary, there is no reasonable probability that if defense counsel had raised the involuntariness argument at trial, the trial court would have suppressed the statements. Therefore, ineffective assistance of counsel has not been established.

## DISPOSITION

The judgment is affirmed.

14

_____
RUSHING, P.J.

WE CONCUR:

_____
MÁRQUEZ, J.

_____
GROVER, J.

*People v. Casas*
**H041362**